AMIT RANA (SBN 291912)
ARana@Venable.com
REBECCA B. HORTON (SBN 308052)
RBHorton@Venable.com
BERIT G. FITZSIMMONS (SBN 313520)
BGFitzsimmons@Venable.com
VENABLE LLP
101 California Street, Suite 3800
San Francisco, CA 94111
Telephone:   415.653.3750
Facsimile:   415.653.3755

*Attorneys for Plaintiff*
*That's No Moon Entertainment Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THAT'S NO MOON ENTERTAINMENT INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL MUMBAUER, an individual,<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT FOR:**<br><br>**(1) TRADEMARK INFRINGEMENT (15 U.S.C. § 1114)**<br><br>**(2) CYBERSQUATTING (15 U.S.C. § 1125(d))**<br><br>**(3) COMPUTER FRAUD (18 U.S.C. § 1030; CAL. PENAL CODE § 502)**<br><br>**(4) CONVERSION**<br><br>**(5) TRESPASS TO CHATTELS**<br><br>**(6) BREACH OF CONTRACT**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT

Plaintiff That's No Moon Entertainment Inc. ("TNM") brings this Complaint against Defendant Michael Mumbauer ("Defendant") and alleges as follows:

## INTRODUCTION

1. TNM is a video game studio established in 2020 that creates innovative, narrative-driven video games. Defendant was one of its founders and its initial CEO, but TNM fired him for cause in 2022. Since then, Defendant—resentful about his termination—has waged a harassment campaign that has included threatening a TNM executive and their family and sporadic but persistent efforts to cripple TNM's business. Defendant also founded a competitor gaming company and currently serves as its CEO.

2. While still at TNM, Defendant purchased—*on TNM's behalf*—a series of domain names that contained variations on the company's name, including its former website, www.ThatsNoMoon.com (collectively, "TNM Domains"). TNM reimbursed Defendant for that purchase, with both parties understanding that TNM would control the domains. However, when he made the purchase, Defendant registered the TNM Domains *in his own name*. He neither relinquished his access nor transferred these domains to TNM upon his termination, despite his obligations to do so. As a result, he has access to and can exercise control over those domains; he can modify website content, take the website down, sell the TNM Domains to third parties, and even disable TNM employees' access to their work e-mail accounts.

3. At 6 a.m. on January 6, 2026, Defendant did exactly that—he hijacked ThatsNoMoon.com, disabling's TNM's own access to that domain and TNM employees' ability to e-mail with any external sender or recipient, then caused the website to redirect to https://www.travelswitzerland.com/en/. Business partners, gamers, and employee candidates were left wondering whether TNM had simply shut down, or whether the company had fired executives who were suddenly unreachable by e-mail. As of the filing of this Complaint, TNM remains unable to

access the domain, and TNM employees remain unable to use their ThatsNoMoon.com e-mail addresses to communicate with anyone outside the company.

4. Accordingly, TNM has suffered and continues to suffer significant damage because of Defendant's actions. It was forced to immediately create a new website domain and move services over to that URL, causing significant business disruptions and costing the company over $1 million dollars *this month alone*. Worse, Defendant's actions continue to cause significant, ongoing, and unknown damage to TNM's reputation, goodwill, and brand with ripple effects that TNM will feel for years to come.

5. TNM brings this action not only to recover for the damage Defendant has already inflicted, but to once and for all end his harassment campaign and stop him from hijacking the TNM Domains and e-mail accounts in the future. Despite TNM's multiple demands, Defendant still has not relinquished control over the TNM Domains that he *never rightfully controlled in the first place*. His actions have escalated in the past weeks and TNM now seeks the Court's intervention to prevent Defendant from unlawfully inflicting even more irreparable damage on the company.

## JURISDICTION AND VENUE

6. The Court has original subject matter jurisdiction over all claims arising under federal law pursuant to 28 U.S.C. §§ 1331 and 1338 and 15 U.S.C. § 1121. The Court has subject matter jurisdiction over those claims arising under state law pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy.

7. The Court has personal jurisdiction over Defendant because he has committed the wrongful acts complained of and caused injury to TNM within California.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391

because a substantial portion of the events or omissions giving rise to this action occurred in this district.

## PARTIES

9. TNM is a video game studio incorporated under the laws of the state of Delaware with its principal place of business in Los Angeles, California.

10. Defendant is an individual who, on information and belief, resides in Encinitas, California.

## FACTUAL BACKGROUND

11. In 2020, a group of four video game developers—including Tina Kowalewski, Taylor Kurosaki, Nick Kononelos, and Defendant (collectively, "Founders")—formed TNM, a video game studio that aims to create captivating, narrative-driven video games. Defendant was selected as TNM's first CEO.

12. TNM assembled a team of talented developers who have worked on the most acclaimed video games in history. The studio obtained outside funding and has been working hard on its first project, a singleplayer action-adventure game.

13. The studio has spent countless hours and millions of dollars to stand out in a crowded industry as a brand that gamers recognize, trust, and seek out for its games.

14. The Founders recognized that one critical component of establishing TNM's brand was a well-designed website that communicated the values of the studio and provided important updates to its nascent but rapidly growing fanbase.

15. In the fall of 2020, the Founders decided to purchase and register with GoDaddy.com 13 domain names that included "That's No Moon" or a "That's No Moon"-formative variation of that mark.[1]

---

[1] Those domains included: ThatsNoMoon.com; TNMgames.com; TNMstudios.com; ThatsNoMoonent.com; ThatsNoMoonInc.com; ThatsNoMoonTV.com; ThatsNoMoonfilm.com; ThatsNoMoonfilms.com; TNMinteractive.com; TNMproductions.com; ThatsNoMoonGames.com; ThatsNoMoonInteractive.com; and ThatsNoMoonEntertainment.com.

16. In TNM's early days, the Founders typically personally incurred business expenses that TNM later reimbursed. The Founders understood and expressly agreed that TNM then owned whatever goods or services the Founders had purchased that way.

17. In or around September 2020, Defendant agreed to purchase the TNM Domains on TNM's behalf. On November 12, 2020, the parties executed a promissory note in which TNM agreed to pay Defendant $2,836.75, plus interest. The note guaranteed TNM would reimburse Defendant for any expenses he incurred on TNM's behalf, including for purchasing the TNM Domains. Defendant spent $2,462.91 for the TNM Domains, and on February 24, 2021, Defendant sought reimbursement for that purchase. On April 5, 2021, TNM paid Defendant $2,842.14 under the promissory note, which included the original loan amount, plus interest, and encompassed reimbursement for the purchase of the TNM Domains.

18. Pursuant to GoDaddy's procedures, an individual must be listed as the "owner" of the domain keys and login information to maintain the domain's active status. Defendant listed himself as that named individual for the TNM Domains. Regardless of that administrative requirement, TNM and the Founders intended that TNM alone would use the TNM Domains. Indeed, TNM used them consistently until Defendant began unlawfully interfering with its access after his termination.

19. While an employee at TNM, Defendant signed an Amended and Restated Proprietary Information, Inventions and Non-Solicitation Agreement ("PIIA") with TNM, attached as **Exhibit A**. In relevant part, the PIIA provided,

- "I understand that I am . . . prohibited from accessing the Company's computer systems and databases for any unauthorized, improper or competitive purpose, both while employed and thereafter."
- "At any time upon request and on termination of my employment, I

-4-
COMPLAINT

- - will return all Company property to the Company immediately."
- - "The Company owns all Company-related digital and social media accounts (including all passwords, data posts, digital works and goodwill therein) that I may create, manage, contribute to, or administer during my employment with the Company . . . . At any time upon request and immediately upon my termination of employment for any reason, I will surrender full control and access to such accounts to the Company."

20. Over time, the other Founders and TNM's Board of Directors determined that Defendant's vision for the company did not align with theirs and that he had breached his duty to act in TNM's best interests. For example, while serving as CEO, Defendant leaked confidential and sensitive information to the media and to competitors.

21. On February 17, 2022, TNM terminated Defendant's employment with the company for cause.

22. On July 11, 2022, a member of TNM's IT team requested that Defendant unlock and generate authorization codes for each of the 13 TNM Domains so they could be transferred to TNM. Defendant ignored the request. On July 14, 2022, TNM's IT team followed up. Without any further explanation, Defendant replied, "This wont [*sic*] be happening."

23. On January 9, 2023, TNM submitted a Complaint to the National Arbitration Forum demanding that Defendant transfer the TNM Domains to TNM. On February 3, 2023, the Forum denied that request because TNM had not provided its trademark registrations as evidence of its rights to "That's No Moon" and "That's No Moon"-formative marks.

24. That is no longer an issue. TNM has now received several registrations for the "That's No Moon" word and design marks (collectively, "TNM Marks"), registration certificates for which are attached as **Exhibit B**:

| U.S. Trademark Registration Number | Registration Date | Trademark | Wordmark |
|---|---|---|---|
| 6874240 | October 11, 2022 | THAT'S NO MOON | THAT'S NO MOON |
| 7158361 | September 5, 2023 | THAT'S NO MOON | THAT'S NO MOON |
| 7158360 | September 5, 2023 | (logo) | T N M |

25. The TNM Marks are inherently distinctive. Further, these marks have acquired distinctiveness due to the significant time and resources TNM has expended in the promotion of the TNM Marks, and its products and services bearing the mark, which has resulted in substantial consumer recognition and goodwill.

26. TNM also has multiple pending trademark applications, including: U.S. Serial No. 90980087; U.S. Serial No. 98136853; U.S. Serial No. 98136850; and U.S. Serial No. 98136852. As evident by TNM's registered and pending applications for TNM-formative marks, in addition to nationwide common law rights to these marks, TNM is the sole owner of the intellectual property ("IP") rights related to the mark, THAT'S NO MOON, and no individual employees, including Defendant, have any rights to that IP.

27. Nonetheless, around 6 a.m. on January 6, 2026, Defendant seized control of the TNM Domains, including ThatsNoMoon.com, which until that point TNM had used as its main website and primary means of public communication. Defendant also cut off TNM employees' ability to e-mail with anyone outside of the company, with senders trying to communicate with TNM employees receiving either a bounce-back message or simply no response at all. ThatsNoMoon.com began redirecting website visitors to https://www.travelswitzerland.com/en/. Crucial business partners, actual and potential investors and customers, and others

wondered if TNM had abruptly shut down or if it had fired key employees who were now unreachable.

28. For the first two days following Defendant's domain hijacking, the TNM team was unable to perform any of its normal work, instead triaging to get critical services back online. TNM was forced to scramble to set up a new URL, ThatsNoMoon.co, and migrate as many services as possible to it. TNM's four-person IT team has spent long hours over multiple days trying to mitigate Defendant's damage as quickly as it can, but TNM continues to suffer irreparable harm and struggle with getting services back online as it discovers new issues caused by Defendant's hijacking.

29. During TNM's forced shutdown, TNM employees were locked out of crucial communication and information management software, and TNM continues to experience issues with those services. TNM also lost communication with its HR providers, resulting in missed payroll reminders and invoices. The TNM website outage was so notable that even well-meaning strangers observed that the website was down and sent TNM messages on LinkedIn suggesting technical fixes. Meanwhile, employee candidates were unable to access TNM's website or contact its recruiters.

30. Since establishing access to e-mail through TNM's new domain, TNM has had to repeatedly confirm that those e-mail accounts are in fact working, as it continues to address bugs associated with the migration to new accounts. For instance, multiple shareholders missed a shareholder meeting because they did not receive an updated meeting invitation sent by e-mail from TNM, or the e-mail went to their spam folders. The TNM leadership team continues to spend substantial time informing external partners and others about the new website and e-mail addresses and reassuring them that the company is healthy.

31. TNM anticipates that the attack's technological fallout alone—never mind its ongoing irreparable and unquantifiable harm to TNM's reputation and

Case 2:26-cv-00542-MWC-AGR   Document 1   Filed 01/20/26   Page 9 of 18   Page ID #:9

1  goodwill—will persist over *the next year*, as the TNM IT team continues to
2  address bugs caused by the forced migration to a new domain.  TNM anticipates
3  that it will have spent *over $1 million* in *this month alone* trying to deal with the
4  damage Defendant inflicted.

5      32.    While dealing with the devastating effects of Defendant's misconduct,
6  TNM sent him a letter on January 7, 2026 demanding that he cease and desist any
7  modification of or interference with the TNM Domains and that he relinquish his
8  unauthorized access to and control of the TNM Domains, even providing
9  instructions on how to easily transfer the TNM Domains.  Defendant did not
10 respond.

11     33.    Although ThatsNoMoon.com stopped redirecting visitors to the
12 Travel Switzerland website, it now redirects to a website explaining that the
13 domain "is available on GoDaddy Auctions," meaning it is "for sale by the current
14 owner."  The cost is $6,666,666, a number that Defendant may well have selected
15 for its Satanic connotation.





26     34.    Even the seemingly harmless redirection to a "for sale" page may
27 cause confusion or negative associations.  For example, TNMProductions.com
28 redirects to a website explaining that the domain is available on GoDaddy

-8-
COMPLAINT

Auctions, but as of January 12, 2026, the page also contained an entirely unrelated article titled, "Drug and Alcohol Education Courses."

> tnmproductions.com
> is available on GoDaddy Auctions.
> Get This Domain
>
> By Staff Writer | 2025-09-04
>
> **Drug and Alcohol Education Courses: Understanding MADD VIP Online Programs for Impactful Learning**
>
> Drug and alcohol education courses have evolved significantly with the introduction of online platforms, particularly through programs like MADD VIP (Mothers Against Drunk Driving Victim Impact Panel) courses. These educational initiatives combine evidence-based curriculum with powerful personal testimonies to create transformative learning experiences that address substance abuse prevention, legal consequences, and community impact. As an education expert, I've observed how these digital platforms make critical safety education more accessible while maintaining the emotional depth and educational rigor necessary for meaningful behavior change.
>
> Related searches
> > 12 Hour Drug and Alcohol Course

35. Defendant's targeting of TNM is nothing new—it is part of an ongoing harassment campaign. Following his termination from TNM in 2022, Defendant posted disruptive comments on social media alluding to the company and team members. He threatened litigation against TNM over fabricated claims about his termination. Even more significantly, he threatened a member of the TNM leadership team whom he blames for his departure through text messages. In one instance, Defendant texted the executive, "This is not going to end well for you. Trust me." Defendant has continued to send threatening texts as late as last year—*over three years* after his termination. On information and belief, Defendant used an unknown phone number to contact the executive on April 24, 2025, texting, "Hope your family is well. They deserve all the stability you can provide Brute," followed by a winking emoji.[2] Moreover, Defendant revealed TNM's confidential business information on multiple different occasions, violating the NDA he had signed.

36. TNM executives and their families rightfully fear for their safety; from his time at TNM, Defendant knows their personal addresses, and he attends the same industry events as TNM executives. One executive has decided to skip

---

[2] The text presumably compared the executive to Marcus Brutus, who famously betrayed Julius Caesar. In Shakespeare's play about Caesar's assassination, Caesar says to Brutus, "Et tu, Brute?" William Shakespeare, *Julius Caesar*, Act 3, Scene 1.

an upcoming high-profile game convention—despite a funder's request that they attend to participate in meetings with a key business partner—because they know Defendant attends every year. Defendant has created an atmosphere where TNM executives are forced to sacrifice their business interests to ensure their personal safety.

37. On information and belief, Defendant currently serves as the CEO of Liithos, a company that aims to—in Defendant's words—"build really powerful entertainment games that are narrative-driven."[3] Liithos is a TNM competitor.

38. TNM fears that in addition to the damage that Defendant has already inflicted, his competitive interest and anger at TNM will drive him to further escalate his unpredictable and harmful behavior. As long as Defendant continues to control the TNM Domains, the company remains under the constant threat of sabotage. Given that the TNM Domains are closely associated with the TNM Marks and brand, TNM likewise faces the ongoing threat of even more irreparable damage to its reputation and goodwill. TNM seeks only to return to its mission of creating games—without the fear that Defendant will once again vindictively try to cripple the company.

## FIRST CAUSE OF ACTION

### (Trademark Infringement, 15 U.S.C. § 1114)

39. TNM incorporates by reference each and every allegation contained above as if set forth herein.

40. TNM owns valid and protectable federal trademark registrations for the TNM Marks, as shown above.

41. Defendant's use of ThatsNoMoon.com and the other TNM Domains, which have names substantively identical to the TNM Marks, is likely to cause confusion, to cause mistake, or to deceive, and in fact has caused consumer

---

[3] *See Gossip ABOUT Gossip: Driving the Future of Gaming with Liithos*, MarketScale, Aug. 2, 2022, https://marketscale.com/industries/software-and-technology/gossip-about-gossip-driving-the-future-of-gaming-with-liithos/.

confusion.

42. Defendant's willful and deliberate infringement has caused and will continue to cause TNM damage in an amount to be determined at trial.

43. Defendant's willful and deliberate infringement has also caused and will continue to cause irreparable injury to TNM's reputation and goodwill, including by leading some business partners to believe that the company had shut down. Such injury will continue until Defendant is enjoined from further violation of TNM's rights.

44. Because of Defendant's willful and deliberate infringement, TNM is entitled to recover up to three times its actual damages, the costs of this action, and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

### (Cybersquatting, 15 U.S.C. § 1125(d))

45. TNM incorporates by reference each and every allegation contained above as if set forth herein.

46. The Anticybersquatting Consumer Protection Act ("ACPA") provides that a "person shall be liable in a civil action by the owner of a mark" if that person "(i) has a bad faith intent to profit from that mark," and "(ii) registers, traffics in, or uses a domain name" that "in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark." 15 U.S.C. § 1125(d).

47. ThatsNoMoon.com and the other TNM Domains are identical or confusingly similar to TNM's "That's No Moon" and "That's No Moon"-formative marks.

48. The TNM Marks are inherently distinctive or have acquired distinctiveness, as they are fanciful or suggestive and are recognized by consumers as identifiers for the That's No Moon brand.

49. Defendant has registered, used, and/or trafficked in ThatsNoMoon.com and the other TNM Domains.

50. Defendant has done so with a bad-faith intent to profit from the TNM Marks because he has no trademark or intellectual property rights in the TNM Domains; the domain name does not consist of his legal or commonly used name; he had no bona fide prior use of the domain; he had no bona fide noncommercial or fair use of the TNM Marks; and he tried "to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site."  15 U.S.C. § 1125(d)(B)(i).

51. Defendant's activities described herein have caused, and continue to cause, significant and irreparable harm to TNM.

52. Under the ACPA, TNM is entitled to a court order that Defendant transfer the TNM Domains to TNM, as well as any other appropriate injunctive relief.  TNM is also entitled to up to three times its actual damages or statutory damages of $1,000 to $100,000 per domain name; costs; and attorneys' fees.

### THIRD CAUSE OF ACTION

**(Computer Fraud, 18 U.S.C. § 1030 and Cal. Penal Code § 502)**

53. TNM incorporates by reference each and every allegation contained above as if set forth herein.

54. Through his actions, Defendant knowingly caused the transmission of a program, information, code, or command, designed to modify ThatsNoMoon.com, causing it to redirect website traffic to a page for "Travel Switzerland," and preventing TNM from accessing the domain.  Defendant has engaged in similar conduct as it relates to the other TNM Domains.

55. As a result of such conduct, Defendant intentionally caused damage

without authorization to protected computers, meaning those used in or affecting interstate or foreign commerce or communication, where damage is any impairment to the integrity or availability of data, a program, a system, or information.  That damage has included financial loss substantially exceeding $5,000.

56. Defendant likewise also—knowingly and without permission—accessed and damaged or destroyed data with the intent to wrongfully control it; used computer services; and disrupted computer services.

57. Defendant's misconduct has caused, and continues to cause, significant and irreparable harm to TNM.

58. TNM is entitled to actual damages and injunctive relief.  Under California Penal Code Section 502(e), TNM is additionally entitled to reasonable attorneys' fees and punitive damages, because Defendant has been guilty of oppression, fraud, and malice within the meaning of California Civil Code Section 3294.  As shown by Defendant's ongoing pattern of misconduct toward TNM, including harassing and threatening one of its executives, he acted with intent to injure TNM, and has engaged in despicable conduct that has subjected TNM to cruel and unjust hardship in conscious disregard of the company's rights.  He also intentionally misrepresented his willingness to relinquish control of the TNM Domains, originally agreeing to do so and accepting reimbursement for the domains from TNM—but then hijacking the TNM Domains to satisfy his personal vendetta and for competitive advantage.

## FOURTH CAUSE OF ACTION
### (Conversion)

59. TNM incorporates by reference each and every allegation contained above as if set forth herein.

60. TNM has always been the sole owner of the TNM Domains. Defendant purchased the TNM Domains on behalf of TNM, and TNM reimbursed

him for that purchase. Defendant has no lawful claim to the TNM Domains and has never alleged otherwise.

62. Nonetheless, Defendant knowingly and intentionally assumed control over and manipulated ThatsNoMoon.com, denying TNM access to that domain. He has also refused to relinquish control over any of the TNM Domains despite TNM's rightful ownership and its demand that he do so.

62. As a result of Defendant's unlawful possession and manipulation of the TNM Domains, TNM has suffered significant and irreparable harm.

63. TNM is entitled to compensation for the detriment caused by the wrongful conversion, including the value of the property at the time of conversion, plus interest, or an amount sufficient to indemnify for loss, and fair compensation for the time and money expended in trying to regain control of the TNM Domains.

64. TNM is also entitled to punitive damages because Defendant has been guilty of oppression, fraud, and malice within the meaning of California Civil Code Section 3294. As shown by Defendant's ongoing pattern of misconduct toward TNM, including harassing and threatening one of its executives, he acted with intent to injure TNM, and has engaged in despicable conduct that has subjected TNM to cruel and unjust hardship in conscious disregard of the company's rights. He also intentionally misrepresented his willingness to relinquish control of the TNM Domains, originally agreeing to do so and accepting reimbursement for the domains from TNM—but then hijacking the TNM Domains to satisfy his personal vendetta and for competitive advantage.

## FIFTH CAUSE OF ACTION
### (Trespass to Chattels)

65. TNM incorporates by reference each and every allegation contained above as if set forth herein.

66. TNM has always been the sole owner of the TNM Domains. Defendant purchased the TNM Domains on behalf of TNM, and TNM reimbursed

him for that purchase. Defendant has no lawful claim to the TNM Domains and has never alleged otherwise.

67. Defendant intentionally interfered with TNM's possession and use of the TNM Domains, including by denying TNM access to and assuming control over ThatsNoMoon.com without TNM's consent. He then manipulated that website so that it would redirect visitors to a "Travel Switzerland" website. Defendant has engaged in similar conduct as it relates to the other TNM Domains. Defendant has refused to relinquish control over any of the TNM Domains despite TNM's rightful ownership and its demand that he do so.

68. As a result of Defendant's trespass upon the TNM Domains, TNM has suffered significant and irreparable harm.

69. TNM is entitled to actual damages and is also entitled to punitive damages because Defendant has been guilty of oppression, fraud, and malice within the meaning of California Civil Code Section 3294. As shown by Defendant's ongoing pattern of misconduct toward TNM, including harassing and threatening one of its executives, he acted with intent to injure TNM, and has engaged in despicable conduct that has subjected TNM to cruel and unjust hardship in conscious disregard of the company's rights. He also intentionally misrepresented his willingness to relinquish control of the TNM Domains, originally agreeing to do so and accepting reimbursement for the domains from TNM—but then hijacking the TNM Domains to satisfy his personal vendetta and for competitive advantage.

## SIXTH CAUSE OF ACTION

### (Breach of Contract)

70. TNM incorporates by reference each and every allegation contained above as if set forth herein.

71. On March 24, 2021, while still a TNM employee, Defendant signed the PIIA with TNM. In relevant part, the PIIA provided,

- "I understand that I am . . . prohibited from accessing the Company's computer systems and databases for any unauthorized, improper or competitive purpose, both while employed and thereafter."
- "At any time upon request and on termination of my employment, I will return all Company property to the Company immediately."
- "The Company owns all Company-related digital and social media accounts (including all passwords, data posts, digital works and goodwill therein) that I may create, manage, contribute to, or administer during my employment with the Company . . . . At any time upon request and immediately upon my termination of employment for any reason, I will surrender full control and access to such accounts to the Company."

72. TNM fully performed its obligations under the PIIA.

73. In or around September 2020, Defendant agreed to purchase the TNM Domains on TNM's behalf, and TNM later reimbursed him for that purchase. TNM therefore owns the TNM Domains.

74. Yet upon his termination from TNM on February 17, 2022, Defendant failed to surrender full control of and access to the TNM Domains. He has likewise failed to do so at the subsequent repeated request of TNM.

75. Instead, on January 6, 2026, Defendant chose not only to access the TNM Domains for an unauthorized, improper, and competitive purpose, but to lock TNM out of its own website and to disable TNM employees' ability to send or receive e-mail from anyone outside the company, among other services.

76. Defendant has therefore breached the PIIA on multiple occasions.

77. Defendant's breaches have caused significant and irreparable harm to TNM, which has been unable to access or exercise control over the TNM Domains that it rightfully owns, and has been forced to contend with the numerous consequences of Defendant's decision to access and unlawfully manipulate

ThatsNoMoon.com.

78. As a result of Defendant's multiple breaches, TNM is entitled to compensatory damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, TNM prays for relief against Defendant as follows:

1. For actual damages and/or statutory damages in an amount to be proven at trial;

2. For injunctive relief, including a temporary restraining order, ordering Defendant to return control of the TNM Domains to TNM, to immediately transfer the TNM Domains to TNM, and to relinquish his own unlawful control over the TNM Domains;

3. For punitive and exemplary damages;

4. For TNM's reasonable attorneys' fees;

5. For costs of suit;

6. For pre- and post-judgment interest; and

7. For such other and further relief as the Court deems just and proper.

Dated: January 20, 2026

VENABLE LLP

By  */s/ Amit Rana*
AMIT RANA
REBECCA B. HORTON
BERIT G. FITZSIMMONS

*Attorneys for Plaintiff*
*That's No Moon Entertainment Inc.*