VENABLE LLP
AMIT RANA (SBN 291912)
ARana@Venable.com
REBECCA B. HORTON (SBN 308052)
RBHorton@Venable.com
BERIT G. FITZSIMMONS (SBN 313520)
BGFitzsimmons@Venable.com
101 California Street, Suite 3800
San Francisco, CA 94111
Telephone:  415.653.3750
Facsimile:   415.653.3755

*Attorneys for Plaintiff*
*That's No Moon Entertainment Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| THAT'S NO MOON ENTERTAINMENT INC., a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL MUMBAUER, an individual, <br><br> Defendant. | Case No. 2:26-cv-00542 <br><br> **PLAINTIFF THAT'S NO MOON ENTERTAINMENT INC.'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE** <br><br> Date:  To Be Determined <br> Time: To Be Determined <br><br> Trial Date:   None set |

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

**TO DEFENDANT AND HIS ATTORNEY OF RECORD:**

PLEASE TAKE NOTICE THAT Plaintiff That's No Moon Entertainment Inc. ("TNM") will and hereby does apply ex parte to this Court, located at 350 West 1st Street, Los Angeles, California 90012, pursuant to Federal Rule of Civil Procedure 65, for a temporary restraining order ("TRO") and an order to show cause why a preliminary injunction should not issue enjoining Defendant Michael Mumbauer ("Defendant") from further interfering with any of TNM's 13 registered domains ("TNM Domains") and compelling him to relinquish his unlawful access to and control over those domains to prevent future irreparable harm to TNM.

TNM makes this Application on the grounds that, first, TNM has a substantial likelihood of success on the merits of its claims against Defendant for (1) trademark infringement, (2) cybersquatting, (3) computer fraud, (4) conversion, (5) trespass to chattels, and (6) breach of contract.  Defendant has hijacked TNM's website, www.ThatsNoMoon.com, preventing TNM from accessing it and manipulating it so that it senselessly and confusingly redirects to random websites, including initially a web page for "Travel Switzerland."  Now consumers visiting TNM's website and the other TNM Domains are redirected to a domain-monetization network that has a banner indicating the domain is being auctioned and that runs ads, including one for "Drug and Alcohol Education Courses."  Defendant also made it impossible for TNM employees to use their e-mail accounts to communicate with anyone outside the company.  Despite TNM's numerous requests, Defendant has unlawfully refused to transfer the TNM Domains to the company, their rightful owner, and continues to make changes to the domains such that TNM faces the ongoing threat that Defendant will inflict harm by manipulating, or even unlawfully auctioning off, the TNM Domains.  TNM played no part in creating the current emergency, and in fact took many measures to try to prevent it.  Second, TNM will suffer irreparable harm if the

ii

Court does not issue a TRO because the TNM Domains are closely associated with TNM's brand and trademarks, so Defendant's manipulation of the TNM Domains has damaged and continues to hurt TNM's reputation and goodwill. Third, the balance of harms and the public interest both strongly favor the issuance of a TRO in these circumstances.

TNM will suffer irreparable prejudice if the Court hears its TRO Application according to regular noticed motion procedures because of the aforementioned ongoing irreparable harm it is suffering.

Pursuant to Local Rule 7-19.1, notice of this Application was given to Defendant on January 20, 2026 at 1:09 p.m. PT. *See* Declaration of Amit Rana, ¶ 5, Ex. D. On January 20, 2026 at 2:02 p.m. PT, Defendant responded noting that he had forwarded the notice to his counsel, that TNM should expect to hear from them, and that he planned to file "a wrongful termination countersuit" against TNM "seeking extensive damages." *See id.* ¶ 7, Ex. D. After this Application is filed, TNM will also instruct a process server to personally serve true and correct copies of this Application and all related materials on Defendant. *See id.* ¶ 8.

The contact information for Defendant is:

Michael Mumbauer
1121 Laurel Cove Ln.
Encinitas, CA 92024
mumbauer@gmail.com
mumbauer@hotmail.com
mumbauer@yahoo.com

TNM's TRO Application is based on this Notice; the supporting Memorandum of Points and Authorities; the concurrently filed declarations of Nick Kononelos and Amit Rana; any oral argument; and any other evidence that the Court may consider in deciding this Application.

| | | |
|---|---|---|
| 1 | Dated:  January 20, 2026 | VENABLE LLP |
| 2 | | By:      _/s/ Amit Rana_____ |
| 3 | | |
| 4 | | AMIT RANA |
|   | | REBECCA B. HORTON |
| 5 | | BERIT G. FITZSIMMONS |
| 6 | | *Attorneys for Plaintiff* |
| 7 | | *THAT'S NO MOON ENTERTAINMENT INC.* |

# **TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................. 1

II.     BACKGROUND .................................................................................. 2

III.    LEGAL STANDARD ........................................................................... 9

IV.     THE COURT SHOULD GRANT TNM'S REQUEST FOR A TRO 10

        A.    TNM Is Likely to Succeed on the Merits of All of Its Claims . 10

              1.    Trademark Infringement .................................................. 10

              2.    Cybersquatting ................................................................ 12

              3.    Computer Fraud .............................................................. 13

              4.    Conversion ...................................................................... 15

              5.    Trespass to Chattels ........................................................ 16

              6.    Breach of Contract .......................................................... 17

        B.    TNM Has Established Irreparable Harm ................................. 18

        C.    The Balance of Harms and Public Interest Strongly Favor an
              Injunction ............................................................................... 21

        D.    The Court Should Not Require a Bond or Alternatively, Should
              Only Require a Nominal Bond ................................................ 21

V.      CONCLUSION ................................................................................ 22

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011)........................................................ 10

*Bestway Inflatables & Material Corp. v. Doe*,
  2022 WL 118413 (N.D. Cal. Jan. 12, 2022) ..................................... 18

*Bosley Med. Inst., Inc. v. Kremer*,
  403 F.3d 672 (9th Cir. 2005)........................................................... 13

*BroadBridge Media, L.L.C. v. HyperCD.Com*,
  2000 WL 680255 (S.D.N.Y. Apr. 27, 2000)...................................... 10

*Brookfield Comms., Inc. v. W. Coast Ent. Corp.*,
  174 F. 3d 1036 (9th Cir. 1999)........................................................ 12

*Cazorla v. Hughes*,
  2014 WL 12235425 (C.D. Cal. Apr. 7, 2014)............................... 13, 18

*Cerelux Ltd. v. Yue Shao*,
  2017 WL 4769445 (C.D. Cal. May 3, 2017)................................ 19, 20

*DSPT Intern., Inc. v. Nahum*,
  624 F.3d 1213 (9th Cir. 2010)......................................................... 12

*eBay, Inc. v. Bidder's Edge, Inc.*,
  100 F. Supp. 2d 1058 (N.D. Cal. 2000) ........................................... 17

*Emerald City Mgmt., LLC v. Kahn*,
  2016 WL 98751 (E.D. Tex. Jan. 8, 2016) ......................................... 12

*Facebook, Inc. v. 9 Xiu Network (Shenzhen) Tech. Co.*,
  2021 WL 5707741 (N.D. Cal. Oct. 21, 2021)................................... 18

*Florey Inst. v. Kleiner Perkins Caufield & Byers*,
  31 F. Supp. 3d 1034 (N.D. Cal. Mar. 26, 2014)............................... 15

*Global Med. Sols., Ltd. v. Simon*,
  2013 WL 12065418 (C.D. Cal. Sept. 24, 2013)................................ 16

*Greenwich Ins. Co. v. Rodgers*,
    729 F. Supp 2d 1158 (C.D. Cal. Jul. 23, 2010) .................................................. 17

*Hidden Empire Holdings, LLC v. Angelone*,
    2022 WL 17080131 (C.D. Cal. Sept. 30, 2022) .............................................. 14

*Idaho v. Coeur D'Alene Tribe*,
    794 F.3d 1039 (9th Cir. 2015) ......................................................................... 10

*Inception Mining, Inc. v. Danzig, Ltd.*,
    311 F. Supp 3d 1265 (D. Utah. 2018) ............................................................. 21

*Intel Corp. v. Hamidi*,
    30 Cal. 4th 1342 (2003) ................................................................................... 16

*Jysk Bed'N Linen v. Dutta-Roy*,
    810 F. 3d 767 (11th Cir. 2015) ....................................................................... 19

*Lee v. Hanley*,
    61 Cal. 4th 1225 (2015) ................................................................................... 15

*Lodestar Anstalt v. Bacardi & Co.*,
    31 F.4th 1228 (9th Cir. 2022) ......................................................................... 11

*Minnesota Min. & Mfg. Co. v. Taylor*,
    21 F. Supp. 2d 1003 (D. Minn. 1998) ............................................................. 21

*Nguyen v. Stephens Inst.*,
    529 F. Supp. 3d 1047 (N.D. Cal. March 30, 2021) ........................................ 15

*Plummer v. Day/Eisenberg, LLP*,
    184 Cal. App. 4th 38 (2010) ........................................................................... 15

*Pom Wonderful LLC v. Hubbard*,
    775 F.3d 1118 (9th Cir. 2014) .................................................................. 10, 11

*Rearden LLC v. Rearden Com., Inc.*,
    683 F.3d 1190 (9th Cir. 2012) ........................................................................ 11

*Six v. Newsom*,
    462 F. Supp. 3d 1060 (C.D. Cal. 2020) .......................................................... 10

*Stuhlbarg Int'l Sales Co., Inc. v. John P. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ...................................................................... 9, 20

*Super-Krete Int'l, Inc. v. Sadleir*,
    712 F. Supp. 2d 1023 (C.D. Cal. 2010) ................................................................. 19

*Thrifty-Tel, Inc. v. Bezenek*,
    46 Cal. App. 4th 1559 (1996) ................................................................................. 16

*Troyk v. Farmers Group, Inc.*,
    171 Cal. App. 4th 1305 (2009) ............................................................................... 17

*U.S. Marine Surveyors, Inc. v. Reiner*,
    2016 WL 9131961 (C.D. Cal. Aug. 4, 2016) ......................................................... 16

*United States v. Middleton*,
    231 F.3d 1207 (9th Cir. 2000) ................................................................................ 13

*Vaquero Energy, Inc. v. Herda*,
    2015 WL 5173535 (E.D. Cal. Sept. 3, 2015) ......................................................... 15

*Verizon California Inc. v. Navigation Catalyst Sys., Inc.*,
    568 F. Supp. 2d 1088 (C.D. Cal. 2008) ................................................................. 19

*ViaView, Inc. v. Blue Mist Media*,
    2012 WL 6007204 (D. Nev. Nov. 30, 2012) .......................................................... 10

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*,
    758 F.3d 1069 (9th Cir. 2014) ................................................................................ 11

**Statutes**

15 U.S.C. § 1116(a) ....................................................................................................... 18

15 U.S.C. § 1125(d) ................................................................................................. 12, 13

18 U.S.C. § 1030 ................................................................................................... *passim*

Cal. Penal Code § 502(c) .............................................................................................. 14

**Court Rules**

Federal Rule of Civil Procedure 65(c) ......................................................................... 21

**Other Authorities**

5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair*
    *Competition* § 30:47 (5th ed. 2025) ...................................................................... 18

# I.    INTRODUCTION

Plaintiff That's No Moon Entertainment Inc. ("TNM") is a California-based video game studio that creates innovative, narrative-driven video games.  It seeks a temporary restraining order ("TRO") to prevent Defendant Michael Mumbauer ("Defendant")—TNM's hostile former CEO who was fired for cause—from inflicting even more irreparable damage to TNM's reputation and goodwill.

While at TNM, Defendant purchased—*on TNM's behalf*—a series of domain names that contained variations on the company's name, including its primary website, ThatsNoMoon.com (collectively, "TNM Domains").  TNM reimbursed Defendant for that purchase, with both parties understanding that TNM would control the domains.  However, when he made the purchase, Defendant registered the TNM Domains *in his own name*.  Contrary to the terms of his employment and termination, Defendant never relinquished his access.

At 6 a.m. on January 6, 2026, Defendant hijacked ThatsNoMoon.com, disabling's TNM's access, including its employees' ability to send or receive e-mail outside the company, then caused the website to senselessly redirect to https://www.travelswitzerland.com/en/.  He also commandeered the other TNM Domains, and he is now attempting to sell all the TNM Domains to third parties.  Despite TNM's many requests, Defendant has refused to transfer the TNM Domains to TNM, their rightful owner.  Instead, he continues to use the TNM Domains to try to sabotage the company.

In the aftermath of Defendant's digital hijacking, TNM scrambled to create a new website and move services over to that URL, causing significant business disruptions, with ripple effects that TNM will feel over the next year.  Worse than the financial damage, Defendant's conduct continues to cause TNM significant, irreparable harm to the reputation and goodwill that it has worked for years to build.  Still today, ThatsNoMoon.com routes to a page indicating that the domain is for sale, with advertisements about subjects like drug and alcohol addiction

VENABLE LLP
101 CALIFORNIA STREET, SUITE 3800
SAN FRANCISCO, CA 94111
415.653.3750

courses.  TNM remains unable to access the TNM Domains, and the company's ThatsNoMoon.com e-mail accounts, which it had used for years, remain largely disabled.  Business partners, investors, customers, gamers, and employee candidates who visit ThatsNoMoon.com or who e-mail the company are left wondering whether TNM shut down or fired key employees who are now unreachable.

Defendant has a documented pattern of harassment—targeting not only TNM, but one of its executives and their family through threatening communications.  But his latest misconduct is a stark escalation that has already crippled core business functions and is causing severe, ongoing irreparable harm.  Absent court intervention, TNM will suffer continuing, immeasurable injury to its reputation and goodwill—harm that cannot be fully repaired or meaningfully quantified in dollars.

## II.  BACKGROUND

In 2020, a group of four video game developers—including Defendant (collectively, "Founders")—formed TNM, a video game studio that aims to create captivating, narrative-driven video games.  Declaration of Nick Kononelos ("Kononelos Decl."), ¶ 2.  Defendant was selected as TNM's first CEO.  *Id*.

TNM assembled a team of talented developers who have worked on the most acclaimed video games in history.  Kononelos Decl., ¶ 3.  The studio obtained outside funding and has been working hard on a major project, a single-player action-adventure game.  *Id*. ¶ 4.  Over the years, the studio has spent countless hours and millions of dollars to stand out in a crowded industry as a brand that gamers recognize, trust, and seek out for its games.  *Id*. ¶ 5.

The Founders recognized that one critical component of establishing TNM's brand was a well-designed website that communicated the values of the studio and provided important updates to its nascent but rapidly growing fanbase.  Kononelos Decl., ¶ 6.  In the fall of 2020, the Founders decided to purchase and register with

GoDaddy.com 13 domain names that included "That's No Moon" or a "That's No Moon"-formative variation of that mark.[1]  *Id.* ¶ 7.

In TNM's early days, the Founders typically personally incurred business expenses that TNM later reimbursed; the Founders understood and expressly agreed that TNM owned whatever goods or services they purchased.  Kononelos Decl., ¶ 8.  In or around September 2020, Defendant agreed to purchase the TNM Domains on TNM's behalf.  *Id.* ¶ 9.  On November 12, 2020, the parties executed a promissory note in which TNM agreed to pay Defendant $2,836.75, plus interest. *Id.* ¶ 10, Ex. A.  The note guaranteed TNM would reimburse Defendant for any expenses he incurred on TNM's behalf, including for purchasing the TNM Domains.  *Id.* ¶ 11.  In total, Defendant spent $2,462.91 for the TNM Domains, and on February 24, 2021, Defendant sought reimbursement for that purchase.  *Id.* ¶ 12.  On April 5, 2021, TNM paid Defendant $2,842.14 under the promissory note, which included the original loan amount, plus interest, and encompassed reimbursement for the TNM Domains.  *Id.* ¶ 13.

Pursuant to GoDaddy's procedures, an individual must be listed as the "owner" of the domain keys and login information to maintain the domain's active status.  Kononelos Decl., ¶ 14.  Defendant listed himself as that individual for the TNM Domains.  *Id.*  Regardless of that administrative requirement, TNM and the Founders intended that TNM alone would use the TNM Domains.  *Id.* ¶ 15. Indeed, TNM used them consistently until Defendant began unlawfully interfering with its access after his termination.  *Id.*

While an employee at TNM, Defendant signed an Amended and Restated Proprietary Information, Inventions and Non-Solicitation Agreement ("PIIA") with TNM.  Kononelos Decl., ¶ 16, Ex. B.  In relevant part, the PIIA provided,

---

[1] Those domains included: ThatsNoMoon.com; TNMgames.com; TNMstudios.com; ThatsNoMoonent.com; ThatsNoMoonInc.com; ThatsNoMoonTV.com; ThatsNoMoonfilm.com; ThatsNoMoonfilms.com; TNMinteractive.com; TNMproductions.com; ThatsNoMoonGames.com; ThatsNoMoonInteractive.com; and ThatsNoMoonEntertainment.com.

- "I understand that I am . . . prohibited from accessing the Company's computer systems and databases for any unauthorized, improper or competitive purpose, both while employed and thereafter." Kononelos Decl., Ex. B ¶ 1.

- "At any time upon request and on termination of my employment, I will return all Company property to the Company immediately." Kononelos Decl., Ex. B ¶ 9.

- "The Company owns all Company-related digital and social media accounts (including all passwords, data posts, digital works and goodwill therein) that I may create, manage, contribute to, or administer during my employment with the Company . . . .  At any time upon request and immediately upon my termination of employment for any reason, I will surrender full control and access to such accounts to the Company."  Kononelos Decl., Ex. B ¶ 7.

Over time, the other Founders and TNM's Board became convinced that Defendant's vision for the company did not align with theirs and that he had breached his duty to act in TNM's best interests.  Kononelos Decl., ¶ 17.  For example, while serving as CEO, Defendant leaked confidential and sensitive information to the media and to competitors.  *Id.* ¶ 18.  On February 17, 2022, TNM terminated Defendant's employment with the company for cause.  *Id.* ¶ 19.

On July 11, 2022, a member of TNM's IT team requested that Defendant unlock and generate authorization codes for each of the 13 TNM Domains so they could be transferred to TNM.  Kononelos Decl., ¶ 20, Ex. C. Defendant ignored the request.  *Id.*  On July 14, 2022, TNM's IT team followed up.  *Id.*  Without any further explanation, Defendant replied, "This wont [*sic*] be happening."  *Id.*

On January 9, 2023, TNM submitted a Complaint to the National Arbitration Forum demanding that Defendant transfer the TNM Domains to TNM.  Kononelos Decl., ¶ 21.  On February 3, 2023, the Forum denied that request because TNM

had not provided its trademark registrations as evidence of its rights to "That's No

Moon" and "That's No Moon"-formative marks.  *See id*. ¶ 22.

That is no longer an issue.  TNM has now received several registrations for

the "That's No Moon" word and design marks (collectively, "TNM Marks"),

Kononelos Decl., ¶ 23; Declaration of Amit Rana ("Rana Decl."), ¶ 4, Ex. C:

| U.S. Trademark Registration Number | Registration Date | Trademark | Wordmark |
| --- | --- | --- | --- |
| 6874240 | October 11, 2022 | THAT'S NO MOON | THAT'S NO MOON |
| 7158361 | September 5, 2023 | THAT'S NO MOON | THAT'S NO MOON |
| 7158360 | September 5, 2023 | | T N M |

TNM also has multiple pending trademark applications, including: U.S.

Serial No. 90980087; U.S. Serial No. 98136853; U.S. Serial No. 98136850; and

U.S. Serial No. 98136852.  Kononelos Decl., ¶ 24.  As evident by TNM's

registered and pending applications for TNM-formative marks, in addition to its

nationwide common law rights to the marks, TNM is the sole owner of the

intellectual property ("IP") rights related to the mark THAT'S NO MOON, and no

individual employees, including Defendant, have any rights to that IP.

Around 6 a.m. on January 6, 2026, Defendant seized control of the TNM

Domains, including ThatsNoMoon.com, which until that point TNM had used as

its main website and means of public communication.  Kononelos Decl., ¶¶ 26-27;

*see also* Rana Decl., ¶ 2, Ex. A (showing Defendant as TNM Domains registrant as

of January 6, 2026).  Defendant also cut off TNM employees' ability to e-mail

with anyone outside of the company, with senders receiving either a bounce-back

message or simply no response at all.  *Id*. ¶ 28.  ThatsNoMoon.com began

1  redirecting website visitors to https://www.travelswitzerland.com/en/.  *Id.* ¶ 29.

2  Crucial business partners, actual and potential investors and customers, and others

3  wondered if the TNM had abruptly shut down or if it had fired key employees who

4  were now unreachable.  *Id.* ¶¶ 35-36.

5      For the first two days following Defendant's domain hijacking, TNM was

6  unable to perform any of its normal work, instead triaging to get critical services

7  back online.  Kononelos Decl., ¶ 30.  TNM was forced to scramble to set up a new

8  URL, ThatsNoMoon.co, and migrate as many services as possible to it.  *Id.* ¶ 31.

9  TNM's four-person IT team has spent long hours over multiple days trying to

10  mitigate Defendant's damage as quickly as it can, but TNM continues to suffer

11  irreparable harm and struggle with getting services back online as it discovers new

12  issues caused by Defendant's hijacking.  *Id.* ¶ 32.

13      During TNM's forced shutdown, TNM employees were locked out of

14  crucial communication and information management software, and TNM continues

15  to experience issues with those services.  Kononelos Decl., ¶ 33.  TNM also lost

16  communication with its HR providers, resulting in missed payroll reminders and

17  invoices.  *Id.* ¶ 34.  The TNM website outage was so notable that even well-

18  meaning strangers observed that the website was down and sent TNM messages on

19  LinkedIn suggesting technical fixes.  *Id.* ¶ 37.  Meanwhile, employee candidates

20  were unable to access TNM's website or contact its recruiters.  *Id.* ¶ 38.

21      Since establishing access to e-mail through TNM's new domain, TNM has

22  had to repeatedly confirm that those new e-mail accounts are in fact working, as

23  they continue to address bugs associated with the migration to new accounts.

24  Kononelos Decl., ¶ 39.  For instance, multiple shareholders missed a shareholder

25  meeting because they did not receive a meeting invitation sent by e-mail from

26  TNM, or the e-mail went to their spam folders.  *Id.* ¶ 40.  The TNM leadership

27  team continues to spend substantial time informing external partners and others

28  about the new website and e-mail addresses and reassuring them that the company

1    is healthy.  *Id*. ¶ 41.

2         TNM anticipates that the attack's technological fallout alone—never mind

3    its ongoing irreparable and unquantifiable harm to TNM's reputation and

4    goodwill—will persist over *the next year*, as the TNM IT team continues to

5    address bugs caused by the forced migration to a new domain.  Kononelos Decl.,

6    ¶ 42.  TNM anticipates that it will have spent *over $1 million* in *this month alone*

7    trying to address the damage Defendant inflicted.  *Id*. ¶ 43.

8         While dealing with the devastating effects of Defendant's misconduct, TNM

9    sent him a letter on January 7, 2026 demanding that he cease and desist any

10   modification of or interference with the TNM Domains and that he relinquish his

11   unauthorized access to and control of the TNM Domains, even providing

12   instructions on how to easily transfer the TNM Domains.  Kononelos Decl., ¶ 44,

13   Ex. D.  Defendant did not respond.  *Id*. ¶ 44.

14        Although ThatsNoMoon.com stopped redirecting visitors to the Travel

15   Switzerland website, it now redirects to a website explaining that the domain "is

16   available on GoDaddy Auctions," meaning it is "for sale by the current owner."

17   Kononelos Decl., ¶ 45.  The cost is $6,666,666, a number that Defendant may well

18   have selected for its Satanic connotation.



Even the seemingly harmless redirection to a "for sale" page may cause confusion or negative associations. For example, TNMProductions.com redirects to a website explaining that the domain is available on GoDaddy Auctions, but as of January 12, 2026, the page also contained an entirely unrelated article titled, "Drug and Alcohol Education Courses." Kononelos Decl., ¶ 46.



Defendant's targeting of TNM is nothing new—it is part of an ongoing harassment campaign. Following his termination from TNM in 2022, Defendant posted disruptive comments on social media alluding to the company and team members. Kononelos Decl., ¶ 47. He threatened litigation against TNM over fabricated claims about his termination. *Id.* Even more significantly, he threatened a member of the TNM leadership team whom he blames for his departure through text messages. *Id.* ¶ 48. In one instance, Defendant texted the executive, "This is not going to end well for you. Trust me." *Id.* ¶ 49. Defendant has continued to send threatening texts as late as last year—*over three years* after his termination. *Id.* ¶ 50. It appears that Defendant used an unknown phone number to contact the executive on April 24, 2025, texting, "Hope your family is well. They deserve all the stability you can provide Brute," followed by a winking emoji.[2] *Id.* Moreover, Defendant revealed TNM's confidential business information on multiple different

---

[2] The text presumably compared the executive to Marcus Brutus, who famously betrayed Julius Caesar. In Shakespeare's play about Caesar's assassination, Caesar says to Brutus, "Et tu, Brute?" William Shakespeare, *Julius Caesar*, Act 3, Scene 1.

occasions, violating the NDA he had signed. *Id*. ¶ 47.

TNM executives and their families rightfully fear for their safety; from his time at TNM, Defendant knows their personal addresses, and he attends the same industry events as TNM executives. Kononelos Decl., ¶ 51. One executive has decided to skip an upcoming high-profile game convention—despite a funder's request that they attend to participate in meetings with a key business partner—because they know Defendant attends every year. *Id*. Defendant has created an atmosphere where TNM executives are forced to sacrifice their business interests to ensure their personal security.

It appears that Defendant currently serves as the CEO of Liithos, a company that aims to—in Defendant's words—"build really powerful entertainment games that are narrative-driven."[3] Liithos is a TNM competitor. Kononelos Decl., ¶ 52.

TNM fears that in addition to the damage that Defendant has already inflicted, his competitive interest and anger at TNM will drive him to further escalate his unpredictable and harmful behavior. As long as Defendant continues to control the TNM Domains, the company remains under the constant threat of sabotage. Given that the TNM Domains are closely associated with the TNM Marks and brand, TNM likewise faces the ongoing threat of even more irreparable damage to its reputation and goodwill. TNM seeks only to return to its mission of creating games—without the fear that Defendant will once again vindictively try to cripple the company.

## III.   LEGAL STANDARD

The standard for entry of a TRO is the same as that for a preliminary injunction. *See, e.g.*, *Stuhlbarg Int'l Sales Co., Inc. v. John P. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Specifically, the moving party must show that (1) it is likely to succeed on the merits; (2) it will likely suffer irreparable harm if

---

[3] *See Gossip ABOUT Gossip: Driving the Future of Gaming with Liithos*, MarketScale, Aug. 2, 2022, https://marketscale.com/industries/software-and-technology/gossip-about-gossip-driving-the-future-of-gaming-with-liithos/.

injunctive relief is not granted; (3) the balance of the equities tips in favor of the moving party; and (4) granting the injunction is in the public interest. *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (citing *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014)). "Alternatively, under the Ninth Circuit's 'sliding-scale test,' a temporary restraining order is appropriate if a plaintiff shows (1) serious questions going to the merits[,] (2) a balance of hardships that tips sharply towards the plaintiff[,] . . . (3) a likelihood of irreparable injury[,] and (4) that the injunction is in the public interest." *Six v. Newsom*, 462 F. Supp. 3d 1060, 1067 (C.D. Cal. 2020) (internal citation and quotation marks omitted); *see also All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1133 (9th Cir. 2011).

## IV.    THE COURT SHOULD GRANT TNM'S REQUEST FOR A TRO

The Court should grant TNM's request for a TRO because TNM can show that (1) it is likely to succeed on the merits; (2) it will suffer irreparable harm if injunctive relief is not granted; and (3) the balance of harms and public interest strongly favor an injunction. *See Coeur D'Alene Tribe*, 794 F.3d at 1046. In similar cases, courts have ordered the disputed domains transferred to the trademark owner pending the resolution of litigation. *See, e.g.*, *ViaView, Inc. v. Blue Mist Media*, 2012 WL 6007204, *6 (D. Nev. Nov. 30, 2012); *BroadBridge Media, L.L.C. v. HyperCD.Com*, 2000 WL 680255, at *1 (S.D.N.Y. Apr. 27, 2000). The Court should do so here to prevent Defendant from inflicting further irreparable harm on TNM.

### A.    TNM Is Likely to Succeed on the Merits of All of Its Claims

TNM has a substantial likelihood of success on the merits of its claims against Defendant for (1) trademark infringement, (2) cybersquatting, (3) computer fraud, (4) conversion, (5) trespass to chattels, and (6) breach of contract.

#### 1.    Trademark Infringement

To prove a claim for trademark infringement, a plaintiff must show "(1) a

protectible ownership interest in the mark; and (2) a likelihood of consumer
confusion in the defendant's use of its allegedly infringing mark." *Lodestar
Anstalt v. Bacardi & Co.*, 31 F.4th 1228, 1245 (9th Cir. 2022) (internal quotation
marks omitted) (citing *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1202
(9th Cir. 2012)); *see also Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758
F.3d 1069, 1072 (9th Cir. 2014).

TNM owns valid and protectable federal trademark registrations for the
three TNM Marks, which include the wordmarks "That's No Moon" and "TNM."
The TNM Marks are inherently distinctive.  They also have acquired
distinctiveness as a result of the significant time and resources TNM has expended
in the promotion of the TNM Marks and its products and services bearing the
mark, which has resulted in substantial recognition and goodwill by consumers.
Defendant has no rights to the TNM Marks, and TNM certainly never consented to
his use of them.  Yet he has hijacked and refuses to relinquish control over the
TNM Domains, which all include variations on the TNM Marks.  Moreover,
Defendant's use of the TNM Domains is likely to cause confusion in the
marketplace, if it has not already.  For example, because ThatsNoMoon.com
started redirecting traffic to a "Travel Switzerland" web page, and now redirects to
a domain-monetization network that advertises content like substance abuse
courses, customers are likely to infer an affiliation between TNM and these
redirected sites.  *See* Kononelos Decl., ¶¶ 45-46.  Other TNM Domains also
currently redirect to pages that show they are for sale, which could easily mislead
visitors into thinking TNM is defunct.[4]  *See id*.  That confusion will undoubtedly

---

[4] Importantly, at this early stage, TNM need not show actual confusion to
demonstrate its trademark infringement claim is likely to succeed.  *See, e.g.*, *Pom
Wonderful*, 775 F. 3d at 1131-33 (concluding that the district court abused its
discretion in denying plaintiff's motion for a preliminary injunction because the
"absence of any proof regarding actual confusion" does not affect the court's
likelihood-of-confusion analysis); *see also Wells Fargo*, 758 F.3d at 1072-73 (9th
Cir. 2014) (actual confusion is "of diminished importance" at the preliminary
injunction stage because such a motion occurs early in the litigation  before the
parties "have amassed significant evidence of actual confusion").

persist as long as Defendant controls the TNM Domains.  And as long as Defendant controls the TNM Domains, he can do with them whatever he pleases as part of his harassment campaign against TNM, or in pursuit of his interests as the CEO of a competitor company.

In sum, TNM has demonstrated a strong likelihood of prevailing on its trademark infringement claim.  *See, e.g.*, *Brookfield Comms., Inc. v. W. Coast Ent. Corp.*, 174 F. 3d 1036, 1066-67 (9th Cir. 1999) (concluding that the plaintiff was entitled to a preliminary injunction with respect to infringing domain name because plaintiff had shown the marks were protected and that there was a likelihood of confusion).

### 2.  Cybersquatting

Congress passed the Anti-cybersquatting Consumer Protection Act ("ACPA") to address situations exactly like this, where a cybersquatter engages in bad-faith misuse of a trademarked domain name.  To prove cybersquatting under the ACPA, a plaintiff must show: "(1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted 'with a bad faith intent to profit from the mark.'"  *DSPT Intern., Inc. v. Nahum*, 624 F.3d 1213, 1218-19 (9th Cir. 2010) (quoting 15 U.S.C. § 1125(d)).

First, courts have found that the exact circumstances here—where an employee registers a domain name for its employer and later holds the domain name hostage—fall squarely within the statute's definition of "use."  *See, e.g.*, *DSPT*, 624 F.3d at 1218-20; *see also Emerald City Mgmt., LLC v. Kahn*, 2016 WL 98751, at *14 (E.D. Tex. Jan. 8, 2016).  Second, all of the TNM Domains are variations on either "That's No Moon" or "TNM," meaning they are either identical or confusingly similar to the distinctive TNM Marks, which include both of those wordmarks.

Third, Defendant has acted with a bad-faith intent to profit from the TNM

12

Marks.  Defendant is currently trying to auction ThatsNoMoon.com for *over $6 million*.  Kononelos Decl., ¶ 45.  But "profit," as used in the ACPA, does not even require commercial use or gain.  *See Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 680-81 (9th Cir. 2005).  Rather, Congress provided a list of factors courts may consider when determining whether a defendant has a bad-faith intent to profit. *See* 15 U.S.C. § 1125(d)(B)(i).  As relevant here, Defendant has no trademark or intellectual property rights in the TNM Domains (Factor I); the domain names do not consist of his legal or commonly used name (Factor II); he had no bona fide prior use of the domains (Factor III); he had no bona fide noncommercial or fair use of the TNM Marks (Factor IV); and he tried "to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site" (Factor V).

In sum, TNM has demonstrated a strong likelihood of prevailing on its ACPA claim.  *See, e.g.*, *Cazorla v. Hughes*, 2014 WL 12235425, at *2, *7-12 (C.D. Cal. Apr. 7, 2014) (finding plaintiffs likely to succeed on merits of ACPA claim where they had hired defendants to register, design, and manage websites and domain names on plaintiffs' behalf, and defendants manipulated and refused to return control over the website and domains after relationship with plaintiffs deteriorated).

### 3.   Computer Fraud

The Computer Fraud and Abuse Act prohibits a person from "knowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer."  18 U.S.C. § 1030(a)(5)(A); *see also United States v. Middleton*, 231 F.3d 1207, 1210 (9th Cir. 2000).  A "protected computer" is a computer "which is used in or affecting interstate or foreign commerce or

communication." 18 U.S.C. § 1030(e)(2)(B). The statute defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information," and authorizes a civil action against a violator where they have caused a loss "during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I), (e)(8), (g). The California Comprehensive Computer Data Access and Fraud Act ("CDAFA") is broader still, requiring only that a defendant—knowingly and without permission—accessed and damaged or destroyed data with the intent to wrongfully control it, used computer services, or disrupted computer services, among other offenses. Cal. Penal Code § 502(c)(1), (3), (5).

Here, Defendant transmitted a program, information, code, or a command that rendered the TNM Domains inaccessible by TNM—disabling TNM employees' ability to e-mail with outside parties—and that rerouted web traffic from the TNM website to a "Travel Switzerland" web page. Kononelos Decl., ¶¶ 26-29. In doing so, he intentionally caused impairment to the availability of systems and information, costing TNM well in excess of $5,000. *Id.* ¶ 43. Defendant never had any right to *personal* access to or control over the TNM Domains, which he purchased on TNM's behalf and for which TNM reimbursed him. *Id.* ¶¶ 9-13. Indeed, Defendant was required to relinquish any access upon his termination in 2022. *Id.*, Ex. B ¶¶ 1, 7, 9. There can be no doubt that he fully understands the wrongfulness of his actions, particularly in light of TNM's *repeated* demands that he transfer the TNM Domains to TNM, their rightful owner. Defendant has therefore knowingly and wrongfully tried to control computer services to which he has no lawful right, and has violated both federal and state computer fraud laws.

In sum, TNM has demonstrated a strong likelihood of prevailing on its computer fraud claim. *See, e.g.*, *Hidden Empire Holdings, LLC v. Angelone*, 2022 WL 17080131, at *2, *6-7 (C.D. Cal. Sept. 30, 2022) (holding plaintiffs likely to

succeed on merits of CDAFA claim where they had hired defendant to administer websites, domains, and e-mail accounts, and defendant then locked plaintiffs out of those systems after the business relationship deteriorated); *Vaquero Energy, Inc. v. Herda*, 2015 WL 5173535, at *1, *6-7 (E.D. Cal. Sept. 3, 2015) (finding plaintiff likely to succeed on 18 U.S.C. § 1030(a)(5) claim where former IT contractor had, after termination, accessed plaintiff's computer systems and modified them without permission).

### 4.   Conversion

To prove conversion, a plaintiff must show: "(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." *Nguyen v. Stephens Inst.*, 529 F. Supp. 3d 1047, 1057-58 (N.D. Cal. March 30, 2021) (quoting *Lee v. Hanley*, 61 Cal. 4th 1225, 1240 (2015)). "Neither legal title nor absolute ownership of the property in question is necessary for a conversion claim—'[a] party need only allege it is entitled to immediate possession at the time of conversion.'" *Florey Inst. v. Kleiner Perkins Caufield & Byers*, 31 F. Supp. 3d 1034, 1041 (N.D. Cal. Mar. 26, 2014) (quoting *Plummer v. Day/Eisenberg, LLP*, 184 Cal. App. 4th 38, 45 (2010)). Each of those elements are easily met here.

First, TNM owns the TNM Domains. Defendant purchased the domain registrations on TNM's behalf, submitted a reimbursement request for those domain registrations, and actually received reimbursement from TNM, including interest. *See* Kononelos Decl., ¶¶ 9-13. TNM also owns the TNM Marks that are closely associated with the TNM Domains. Second, despite TNM's repeated requests, Defendant has steadfastly refused to return the TNM Domains to TNM and has instead used them to spitefully damage the company. *See id*. ¶¶ 20-21, 26, 44. Third, Defendant's actions have resulted not only in significant monetary damages because of the cost of creating a new URL and migrating services to it, but ongoing irreversible harm to TNM's goodwill and reputation. For example,

Defendant's attack on TNM's website has caused business partners to question whether the company still exists, or whether it fired executives who became unreachable by e-mail.  Kononelos Decl., ¶¶ 35-36.  Moreover, TNM is at unreasonable and significant risk of Defendant taking further action to sabotage his former employer.

The evidence available at even this early stage demonstrates that TNM has a strong likelihood of success on its conversion claim.  *See, e.g.*, *U.S. Marine Surveyors, Inc. v. Reiner*, 2016 WL 9131961, at *4 (C.D. Cal. Aug. 4, 2016) (holding plaintiffs likely to succeed on merits of conversion claim where defendant registered a domain as plaintiffs' agent or partner and at their direction, then cut off plaintiffs' access and refused to transfer control of the domain, causing lost customers and harm to goodwill).

### 5.    Trespass to Chattels

To prove trespass to chattels, a plaintiff must show: (1) the plaintiff's possession of the property, (2) the defendant's intentional interference with the plaintiff's use of the property without the plaintiff's consent, and (3) damages. *Global Med. Sols., Ltd. v. Simon*, 2013 WL 12065418, at *32 (C.D. Cal. Sept. 24, 2013) (citing *Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1566-67 (1996)). To be actionable, trespass to chattels must have caused some injury to the chattels or to plaintiff's rights in them.  *Id.* (citing *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1350 (2003); *Thrifty-Tel, Inc.*, 46 Cal. App. 4th at 1566).

TNM has always been the sole owner of the TNM Domains.  *See* Kononelos Decl., ¶¶ 9-13.  Defendant purchased the TNM Domains *on behalf of TNM*, and TNM reimbursed him for that purchase.  *Id*.  Defendant therefore has no lawful claim to the TNM Domains, nor has he alleged otherwise—he has simply refused to return them to TNM.  *See, e.g.*, *id*. ¶¶ 20, 44.  TNM continuously used ThatsNoMoon.com as its website until Defendant intentionally interfered with TNM's possession of that site by assuming control over it without TNM's consent,

1   causing it to redirect visitors to a "Travel Switzerland" website. *Id*. ¶¶ 15, 26-29.

2   Defendant's actions will cost TNM *over $1 million* this month just to address the

3   many technological issues they caused, not to mention the irreparable damage

4   Defendant has inflicted on TNM's reputation and goodwill. *Id*. ¶¶ 33-43.

5       In sum, TNM has demonstrated a strong likelihood of prevailing on its claim

6   for trespass to chattels. *See, e.g.*, *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d

7   1058, 1069-72 (N.D. Cal. 2000) (finding that defendant's unauthorized

8   intermeddling with plaintiff's computer system, which diminished the condition,

9   quality, or value of the system by depriving plaintiff of its use, warranted

10  preliminary injunctive relief).

11            6.   Breach of Contract

12      To prove breach of contract, a plaintiff must show: (1) the existence of a

13  contract; (2) that he has performed or that his non-performance is excused; (3)

14  defendant's breach of the contract; and (4) damages resulting from the breach.

15  *Greenwich Ins. Co. v. Rodgers*, 729 F. Supp 2d 1158, 1163 (C.D. Cal. Jul. 23,

16  2010) (citing *Troyk v. Farmers Group, Inc.*, 171 Cal. App. 4th 1305, 1352 (2009)).

17      In 2021, while still a TNM employee, Defendant signed the PIIA with TNM.

18  *See* Kononelos Decl., ¶ 16, Ex. B.  The PIIA contains no less than *three separate*

19  *provisions* either barring Defendant from accessing TNM's systems for any

20  unauthorized, improper, or competitive purpose, or requiring him to return TNM's

21  property (including its digital accounts) upon TNM's request and upon

22  Defendant's termination of employment. *Id*., Ex. B, ¶¶ 1, 7, 9.  TNM terminated

23  Defendant's employment on February 17, 2022, yet Defendant *still*—and in the

24  face of *repeated demands* from TNM—steadfastly and baselessly refuses to

25  relinquish control of the TNM Domains. *See id*. ¶¶ 20-21, 44.  As a result, TNM is

26  unable to control the TNM Domains that it owns, leaving it vulnerable to exactly

27  the type of attack Defendant executed on January 6, 2026, which caused extensive

28  monetary and reputational damage to TNM. *See id*. ¶¶ 27-43.

In sum, TNM has demonstrated a strong likelihood of prevailing on its claim for breach of contract. *See, e.g.*, *Cazorla*, 2014 WL 12235425, at *16-18 (finding plaintiffs likely to succeed on claim for breach of contract where defendants agreed to register and manage domains on behalf of plaintiffs, who would retain ownership, and defendants breached by refusing to relinquish control over domains even after plaintiffs demanded it, causing lost promotional opportunities and sales).

### B.    TNM Has Established Irreparable Harm

Defendant's misconduct has already caused TNM irreparable harm, and that harm will continue until Defendant transfers the TNM Domains to their rightful owner, TNM.

Preliminarily, pursuant to a 2020 amendment to the Lanham Act, a plaintiff seeking injunctive relief is entitled to a rebuttable presumption of irreparable harm upon a finding of likelihood of success on the merits of a trademark infringement or cybersquatting claim. *See* 15 U.S.C. § 1116(a) ("[a] plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits"); 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:47 (5th ed. 2025). TNM is entitled to such a presumption because it has demonstrated its likelihood of succeeding on the merits of its trademark infringement and cybersquatting claims. *See, e.g.*, *Facebook, Inc. v. 9 Xiu Network (Shenzhen) Tech. Co.*, 2021 WL 5707741, at *7 (N.D. Cal. Oct. 21, 2021) (applying presumption of irreparable harm, as appropriate with a finding of trademark infringement, dilution, or cybersquatting); *Bestway Inflatables & Material Corp. v. Doe*, 2022 WL 118413, at *8 (N.D. Cal. Jan. 12, 2022) (same).

Moreover, TNM has already suffered myriad effects from Defendant's January 6, 2026 attack on ThatsNoMoon.com. For example, the attack meant that TNM could no longer access its website or services associated with that domain, leaving TNM employees unable to communicate by e-mail with outside parties,

like business partners and employee candidates.  Kononelos Decl., ¶¶ 27-28.
People wondered whether the company had simply shut down, or whether it had
fired executives who were suddenly unreachable by e-mail.  *Id*. ¶¶ 35-36.  The
TNM leadership team has had to spend substantial time both informing external
partners about the new website and e-mail addresses and reassuring them that the
company is healthy.  *Id*. ¶ 41.  Meanwhile, TNM continues to confront bugs
associated with the migration to the new domain, including an e-mail to
shareholders about a shareholder meeting that many of them either never received
or received only in their spam folders.  *Id*. ¶¶ 39-40.

Although ThatsNoMoon.com no longer redirects to a "Travel Switzerland"
web page, a visitor to the site currently sees that the domain is for sale and
advertising for random unaffiliated services, such as drug and alcohol education.
Kononelos Decl., ¶¶ 45-46.  That message will continue to confuse TNM's
business partners, shareholders, fans, employee candidates, and others about
TNM's association with the content on these redirected sites, in addition to causing
confusion about TNM's status as a company, inflicting still more damage to the
reputation and goodwill it has spent years and millions of dollars building.  *See,
e.g.*, *Super-Krete Int'l, Inc. v. Sadleir*, 712 F. Supp. 2d 1023, 1037 (C.D. Cal.
2010) ("Plaintiff has demonstrated irreparable injury based on the threatened loss
of prospective customers who would be diverted away from its website should it be
unable to gain control over the domain name"); *Verizon California Inc. v.
Navigation Catalyst Sys., Inc.*, 568 F. Supp. 2d 1088, 1097-98 (C.D. Cal. 2008)
(loss of control over URL domains containing trademark establishes irreparable
harm); *Jysk Bed'N Linen v. Dutta-Roy*, 810 F. 3d 767, 771-72, 780 (11th Cir.
2015) ( "If the websites were not transferred to Jysk, Jysk would not have had full
control over websites that bear its trademark and could have lost goodwill.").

*Cerelux Ltd. v. Yue Shao*, 2017 WL 4769445 (C.D. Cal. May 3, 2017), is
instructive.  In that case, plaintiff Cerelux operated a business at the domain name

19

www.nootropics.com.  *Id*. at *2.  The defendants—who had previously controlled that domain but sold it to Cerelux's CEO—hijacked the domain and replaced Cerelux's website with their own philosophy-related site.  *Id*.  The court concluded that Cerelux was "likely to suffer irreparable harm if Defendants [were] permitted to continue exercising complete control over Cerelux's website."  *Id*. at *8.  The defendants argued that because they did not plan to operate a competing business from www.nootropics.com, and because Cerelux had purchased an alternate domain from which to run its business, Cerelux could not claim irreparable harm. *Id*.  The court disagreed: "the confusion caused among Cerelux's customers, who may no longer be able to find Cerelux's products online and may be confused as to Cerelux's connection with [philosophy], is both ongoing and not compensable via monetary damages.  The ongoing damage to Cerelux's reputation and goodwill is irreparable, and sufficient to support issuance of a preliminary injunction."  *Id*. The same is true here—even though Defendant is not operating a competing business from the TNM Domains, his interference with those domains is bound to continue confusing TNM's business partners and fans, among others, inflicting significant harm that money cannot fix.  *See Stuhlbarg*, 240 F.3d at 841 ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.").

Crucially, Defendant still controls all the TNM Domains, which he could manipulate *at any time*, presenting whatever information he would like under the guise of the TNM Marks.  Defendant has demonstrated time after time his anger at TNM over his termination and his willingness to harm both the company and its personnel.  Moreover, he is an industry veteran with connections in the video game world, and even currently serves as the CEO of one of TNM's competitors.  *See* Kononelos Decl., ¶ 52.  TNM will face the constant threat of even more irreparable harm without an injunction forcing Defendant to stop his current interference with the TNM Domains and to relinquish control over them.

## C.   The Balance of Harms and Public Interest Strongly Favor an Injunction

The balance of harms and public interest strongly favor an injunction here. As detailed above, TNM continues to suffer irreparable damage because of Defendant's access to and control over the TNM Domains.  Defendant, meanwhile, has no legitimate interest in or right to either the TNM Domains or the TNM Marks that are closely associated with the domain names.  He has refused to transfer the TNM Domains to TNM, their rightful owner, solely out of resentment toward the company over his termination and his competitive interest in TNM's failure.  Stopping Defendant's further manipulation of the TNM Domains and transferring them to TNM does not harm Defendant in the least—it simply ensures he can no longer sabotage TNM on a whim, as he has before.

At the same time, the public interest strongly favors an injunction. Defendant's continued ability to manipulate the TNM Domains can only further harm the public by creating confusion about TNM's status.  Moreover, the public has a significant interest in preventing conduct like Defendant's: cybersquatting is "a misuse of the Internet, which is a resource that has the potential to benefit hundreds of millions of people.  There is a strong public interest in stopping such misuses." *Minnesota Min. & Mfg. Co. v. Taylor*, 21 F. Supp. 2d 1003, 1005 (D. Minn. 1998).  In short, both the public interest and the balance of equities strongly favor an injunction here.

## D.   The Court Should Not Require a Bond or Alternatively, Should Only Require a Nominal Bond

Federal Rule of Civil Procedure 65(c) requires a bond as security for a TRO or preliminary injunction.  Fed. R. Civ. P. 65(c).  However, this Court has the power to waive that requirement where a defendant fails to identify "any specific costs or damages that may accrue to Defendant[] from the [TRO or] preliminary injunction." *Inception Mining, Inc. v. Danzig, Ltd.*, 311 F. Supp 3d 1265, 1283 (D.

21

Utah. 2018).  Here, Defendant cannot possibly identify any damages he will suffer simply because he is no longer able to wrongfully interfere with the TNM Domains, nor will restoring TNM's access to those domains or transferring them to TNM impose any cost on Defendant.  *See* Kononelos Decl., Ex. D at 4 (noting, in cease-and-desist letter, simple procedure for transferring control of TNM Domains to TNM).  Indeed, the TNM Domains do not impact and are not in any way affiliated with Defendant individually or his business.  Accordingly, TNM respectfully requests that the Court issue a TRO without bond, or, alternatively, that TNM be required to post only a nominal bond.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court should issue a TRO and an order to show cause why a preliminary injunction should not issue enjoining Defendant from further interfering with any of the TNM Domains and compelling him to relinquish his unlawful access to and control over those domains to prevent future irreparable harm to TNM.

Dated:  January 20, 2026          VENABLE LLP

By:    <u>*/s/ Amit Rana*</u>

AMIT RANA
REBECCA B. HORTON
BERIT G. FITZSIMMONS

*Attorneys for Plaintiff*
*THAT'S NO MOON ENTERTAINMENT*
*INC.*

22

1

## <u>Certificate of Compliance with Local Rule 11-6.1</u>

2

The undersigned, counsel of record for Plaintiff That's No Moon

3

Entertainment Inc., certifies that this brief contains 6,760 words (including

4

headings, footnotes, and quotations but excluding the caption, the table of contents,

5

the table of authorities, the signature block, this certification, and any indices and

6

exhibits), which complies with the 7,000-word limit set by Local Rule 11-6.1.

7

8  Dated:  January 20, 2026            VENABLE LLP

9                                                   By:      _/s/ Amit Rana_

10                                                       AMIT RANA
11                                                       REBECCA B. HORTON
                                                         BERIT G. FITZSIMMONS

12
13                                                       *Attorneys for Plaintiff*
                                                         *THAT'S NO MOON ENTERTAINMENT*
14                                                       *INC.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28